NOT DESIGNATED FOR PUBLICATION

No. 122,038

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

LINDA KAY SUTTON,
*Appellant*.


MEMORANDUM OPINION

Appeal from Johnson District Court; THOMAS KELLY RYAN, judge. Opinion filed June 25, 2021. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.


Before WARNER, P.J., BUSER and CLINE, JJ.


PER CURIAM: Linda Kay Sutton appeals her conviction of possession of methamphetamine, which stemmed from an incident during a September 2018 traffic stop of her boyfriend's vehicle. Law enforcement first handcuffed Sutton, a passenger in the vehicle, on the mistaken belief she had an outstanding warrant. Once they realized their mistake, they removed the handcuffs. In the meantime, a baggie of methamphetamine was found on Sutton's boyfriend. Later, Sutton's boyfriend conspicuously passed the baggie of methamphetamine to Sutton while they were kissing in front of the police officers. The officers arrested Sutton for possession of methamphetamine. She moved to

1

suppress, arguing officers discovered the methamphetamine while they unlawfully detained her under the Fourth Amendment to the United States Constitution.

We find the district court properly denied Sutton's motion to suppress because we do not find the traffic stop became unlawful and, alternatively, the evidence is admissible under the attenuation doctrine, an exception to the Fourth Amendment exclusionary rule.

FACTS

On September 16, 2018, Officers John Dawdy and Corby Adams of the Kansas City, Missouri Police Department pulled over Christopher Bell and Sutton for a traffic infraction. The officers began the traffic stop in Missouri, but Bell did not stop until just after they crossed state lines into Kansas. After realizing they were in Leawood, Kansas, the officers radioed the Leawood Police Department to take over the case, per protocol. It took around 40 minutes for the Leawood officers to arrive.

Bell did not have a driver's license and was acting very nervous. The officers removed him from the vehicle out of concern he would flee. The officers also removed Sutton, as a safety precaution, due to traffic on the I-435 Highway where Bell stopped. Upon running a warrant check, Officer Adams believed Sutton had an active felony arrest warrant, so he placed her in handcuffs while he tried to verify the warrant. Once he determined Sutton's real identity and that she did not have any outstanding warrants, he removed her handcuffs.

After Officer Adams removed Sutton's handcuffs, she stood next to the police vehicle, near the guardrail, while the Missouri officers awaited the arrival of the Leawood Police Department. She was not searched. The officers did not tell her she was free to leave, nor did she ask to leave. Officer Adams watched her as she stood near the guardrail. She was not further questioned after removal of the handcuffs.

2

In the meantime, Officer Dawdy searched Bell and discovered a baggie of methamphetamine in his pocket. By then, another Kansas City, Missouri police officer, Damon Hawley, had joined the traffic stop to provide back up. Officer Hawley placed the baggie of methamphetamine underneath the middle console area of Officer Dawdy's patrol vehicle. The officers handcuffed Bell and put him in the passenger seat of Officer Dawdy's patrol vehicle while they awaited the arrival of the Leawood Police Department. Officer Hawley got into the driver's seat of the patrol vehicle with Bell and immediately realized the baggie of methamphetamine was gone. He assumed Officer Dawdy had moved the baggie when placing Bell in the car.

During the investigation of Bell, Sutton asked Officer Adams if she could have her styrofoam QuikTrip cup from Bell's vehicle. Officer Adams gave her the cup after inspecting it to ensure it did not contain contraband.

While Officer Hawley was in the patrol car with Bell, Bell asked if he could speak with Sutton. Officer Hawley waved Sutton over to the patrol vehicle and rolled down Bell's window, so they could talk. Sutton leaned down to Bell, and they began whispering to each other. Sutton moved towards Bell like they planned to kiss, then looked at Officer Hawley. She gave Bell "a little peck" and stood back up. She stood around by the vehicle for a bit, then Bell began whispering to her again. At that point, Sutton leaned back into the vehicle and started giving Bell a very wide, open-mouthed kiss, during which Bell appeared to move something in his mouth with his tongue.

Officer Hawley suspected Bell was trying to remove something from his mouth and pass it over to Sutton's mouth. He did not reveal his suspicion right away because he did not want Bell or Sutton to swallow whatever they were passing. The kiss ended when Officer Hawley joked that he was getting uncomfortable. Then, Sutton and Bell started another wide, open-mouthed kiss. Again, Officer Hawley could see Bell's mouth protruding, which Officer Hawley assumed was caused by Bell's tongue movement. After

3

this kiss, Sutton immediately took a step back. Officer Hawley saw her lean down and spit into her QuikTrip cup.

Officer Hawley announced the conversation was over, rolled up the passenger side window, and called out for Officer Dawdy. Officer Adams told Sutton to come stand closer to the guardrail. Officer Hawley then explained to the other officers what he had witnessed, relaying his suspicions that Bell had passed something to Sutton, who then spit it into the QuikTrip cup. The officers searched the QuikTrip cup and found what looked like the same baggie of methamphetamine they had removed from Bell.

The officers arrested Sutton and charged her with possession of methamphetamine and interference with law enforcement. The district court dismissed the interference charge after a preliminary hearing and bound Sutton over on the possession charge. Sutton moved to suppress the methamphetamine evidence, arguing officers illegally detained her after removing the handcuffs. The State argued Sutton was not illegally detained and, even if she was, the evidence was admissible since officers discovered it because of Sutton's intervening actions in the presence of officers.

Officers Dawdy, Adams, Hawley, and Christopher Hargis all testified at the hearing on the motion to suppress. Officer Hawley testified that, based on his 13 years of training and experience in narcotics, he suspected Bell and Sutton were passing something between their mouths while kissing. While Officer Hawley admitted he normally allows someone in handcuffs to communicate and kiss, Bell's actions in apparently sweeping the inside of his mouth with his tongue, causing his mouth to protrude, made Officer Hawley suspect Bell and Sutton passed something while kissing. Officer Hawley also found Sutton's actions suspicious after they separated, when she immediately took a step to the left, leaned a QuikTrip cup to her mouth, and spit into the cup.

The district court did not reach the State's argument on intervening causation since it found the officers did not improperly detain Sutton and denied the motion to suppress. The district court found the Missouri officers properly suspended their investigation while awaiting the arrival of the Leawood, Kansas officers. It found the Missouri officers also acted reasonably when asking Sutton to stand by the guardrail while awaiting the Kansas officers, since they were all stopped on a busy highway on a hot day. The court noted the Missouri officers accommodated Sutton's requests while awaiting the Kansas officers, including retrieving her QuikTrip cup out of the car and allowing her to interact with Bell, even kissing him three times.

Sutton moved to reconsider, relying heavily on the fact that one of the officers admitted he believed Sutton was detained while awaiting the arrival of the Kansas officers. The district court did not find this testimony provided sufficient basis to change its prior ruling. The district court again pointed to Sutton's behavior (kissing Bell three times, trying to pass something with their mouths) during the suspension of the investigation to support its decision to deny both the motion to suppress and the motion to reconsider.

The parties agreed to a bench trial on stipulated facts, after which the district court found Sutton guilty of possession of methamphetamine.

On appeal, Sutton argues the district court erred in denying her motion to suppress. Sutton maintains that, considering the totality of the circumstances after removal of the handcuffs, a reasonable person in her place would not have felt free to leave, and therefore the encounter was not voluntary. She argues the methamphetamine later obtained must be excluded as "fruit of the poisonous tree" because the officers had illegally seized her when they discovered the evidence. See *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963); *State v. McGinnis*, 290 Kan. 547, 552-53, 233 P.3d 246 (2010).

5

The State counters that the encounter between Sutton and the officers was voluntary after removal of the handcuffs. Further, even if the encounter were involuntary, the State argues Sutton's commission of a new crime was an intervening event, allowing for the admission of the methamphetamine evidence.

ANALYSIS

*The totality of the circumstances reveals that, after removal of Sutton's handcuffs, her encounter with law enforcement was voluntary.*

When a law enforcement officer makes a traffic stop, the driver and any passengers in the car are seized under the Fourth Amendment. *State v. Golston*, 41 Kan. App. 2d 444, 450, 203 P.3d 10 (2009). In Kansas, a detention may not exceed the scope or duration necessary to carry out the purpose of the traffic stop. *State v. Thompson*, 284 Kan. 763, 774, 166 P.3d 1015 (2007).

Sutton does not contest the validity of the initial traffic stop, nor does she challenge the actions of any officers when she was briefly handcuffed while they mistakenly believed she had an outstanding warrant. Instead, she argues her unlawful seizure began after removal of her handcuffs, while the Missouri officers awaited the arrival of the Kansas officers. Sutton seeks suppression of the methamphetamine evidence discovered in her QuikTrip cup since the officers obtained it as a direct result of her supposed illegal seizure. See *State v. Christian*, 310 Kan. 229, 234, 445 P.3d 183 (2019) (explaining a court may suppress the "'primary evidence obtained as a direct result of an illegal search or seizure' and 'evidence later discovered and found to be derivative of an illegality,' the so-called 'fruit of the poisonous tree' if it finds officers obtained evidence in violation of the Fourth Amendment").

The State contends that after removal of Sutton's handcuffs, the encounter between Sutton and the officers became consensual, at least until Sutton provided the officers with

reasonable suspicion that she committed a crime. While Sutton argued below that her romantic encounter with Bell, the missing baggie of methamphetamine, and her action of spitting into her QuikTrip cup right after kissing Bell did not provide the officers with reasonable suspicion to search her QuikTrip cup, she has abandoned those arguments on appeal. See *State v. Arnett*, 307 Kan. 648, 650, 413 P.3d 787 (2018) (issues not briefed are considered waived or abandoned). The only question she raises on appeal is whether the district court erred in denying her motion to suppress because it concluded her encounter with law enforcement was voluntary.

When the factual underpinnings of a district court's decision on a motion to suppress are challenged, we review those factual findings to determine whether they are supported by substantial competent evidence. *State v. Jones*, 279 Kan. 71, 73, 106 P.3d 1 (2005). In cases like this one, where the facts are undisputed, we need only examine the district court's legal conclusion drawn from the facts, which we review de novo. 279 Kan. at 73-74.

The United States Supreme Court has created a "totality of the circumstances" test to determine whether an encounter is a seizure or a voluntary encounter. *McGinnis*, 290 Kan. at 552. Under this test, a police officer's interaction with a civilian is voluntary, and not a seizure, if, under the totality of the circumstances, the police officer's conduct conveys to a reasonable person that he or she was free to disregard the officer and go about his or her business. 290 Kan. at 552-53.

Over the years, Kansas appellate courts have recognized several objective factors to help determine whether a law enforcement-citizen encounter is voluntary or an investigatory detention. *State v. Walker*, 292 Kan. 1, 6, 251 P.3d 618 (2011). "This nonexhaustive and nonexclusive list includes:  the presence of more than one officer, the display of a weapon, physical contact by the officer, use of a commanding tone of voice, activation of sirens or flashers, a command to halt or to approach, and an attempt to

7

control the ability to flee." 292 Kan. at 6-7 (citing *State v. Lee*, 283 Kan. 771, 775, 156 P.3d 1284 [2007]; *State v. Morris*, 276 Kan. 11, 19-20, 72 P.3d 570 [2003]; *State v. Gross*, 39 Kan. App. 2d 788, 798-800, 184 P.3d 978 [2008]).

The application of these factors is not rigid; we must analyze the facts of each case independently. *McGinnis*, 290 Kan. at 553. Our Supreme Court has held that "[i]n applying the totality of the circumstances test in a Fourth Amendment context, no one factor is legally determinative, dispositive, or paramount. The outcome does not turn on the presence or absence of a single controlling or infallible touchstone and requires careful scrutiny of all the surrounding circumstances." *Thompson*, 284 Kan. 763, Syl. ¶ 20. But the court clarified:  "[W]e do not expect courts to merely count the number of factors weighing on one side of the determination or the other. In the totality of the circumstances, a factor may be more indicative of a coercive atmosphere in one case than in another." 284 Kan. at 804.

When looking at the totality of the circumstances and applying these objective factors, we agree with the district court that, after removal of the handcuffs, Sutton's encounter with law enforcement became voluntary.

To begin with, Sutton does not claim it was improper for the officers to suspend the traffic investigation while awaiting the arrival of the Leawood, Kansas officers. She does not claim lack of diligence on the part of any of the officers (either the Missouri officers, in contacting the Kansas officers, or the Kansas officers, in responding to the call). She did not ask to leave the scene, nor does she claim any officer told her she could not leave. She was not searched. While there were three Missouri officers on the scene, only one of them was watching Sutton. The other two were investigating Bell. After removal of the handcuffs, she was not physically restrained. She did not ask to contact anyone to come pick her up, nor does she claim the officers told her she could not contact anyone. The officers did not show their weapons or speak in a commanding tone. She

8

does not contest the officers' reasoning for asking her to stand by the guardrail—they were stopped on a busy highway on a hot day—nor does she dispute the State's claims that the officers accommodated all her requests, including retrieving her cup from Bell's car and allowing her to interact with Bell. Indeed, she kissed Bell three times during the time at issue, apparently trying to pass something with their mouths, in plain sight of the officers. Last, the officers did not continue to question Sutton after removal of her handcuffs. Instead, the evidence shows one of them passively watched her while awaiting the Kansas officers.

Sutton argues the best evidence that her encounter was not voluntary is Officer Adams' testimony at the preliminary hearing that he believed Sutton was detained after removal of her handcuffs, while awaiting the arrival of the Leawood, Kansas officers. The Missouri officers testified they suspended the investigation during this time. Yet Sutton admits Officer Adams' subjective belief is not dispositive and, indeed, our Supreme Court has rejected another panel of this court's emphasis on an officer's subjective intent to detain. Relying on *Whren v. United States*, 517 U.S. 806, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996), and *United States v. Anderson*, 114 F.3d 1059 (10th Cir. 1997), our Supreme Court found the totality of the circumstances test only considers objective factors, noting "the law renders the officer's subjective intent irrelevant unless the [defendant] is somehow made aware of the intent." *Thompson*, 284 Kan. at 805-07. Here, there is no evidence Officer Adams communicated to Sutton his subjective intent to detain her after he removed the handcuffs. In fact, Sutton admits no one told her she was not free to leave.

Sutton also relies on the fact that none of the officers told her she was free to leave after removal of the handcuffs to support her claim of unlawful detention. However, this argument ignores the law in Kansas, which does not require the officer(s) to physically disengage for the continued encounter to become voluntary. *Thompson*, 284 Kan at 801-02. Indeed, in *Thompson*, our Supreme Court acknowledged the United States Supreme

9

Court rejected such a requirement in *Ohio v. Robinette*, 519 U.S. 33, 39-40, 117 S. Ct. 417, 136 L. Ed. 2d 347 (1996). *Thompson*, 284 Kan. at 802 (noting such "bright-line" rule contradicts established fact-specific inquiry that looks to totality of circumstances).

Sutton also claims her encounter was not voluntary because Officer Adams "had to" get her drink from Bell's car, he looked in the cup before he gave it to her, and "she had to obtain permission to interact with Mr. Bell, who was sitting in handcuffs in a police car." Actually, when considered in the totality of the circumstances, these facts do not suggest the officers "were controlling the circumstances." First, Sutton asked Officer Adams to retrieve her cup. There is no evidence he told her that he "had to" retrieve it. Next, at the time of Sutton's requests, Bell was under arrest and being actively investigated. Her requests for a cup from a car that was under investigation and to interact with someone who was just arrested have more to do with the condition of Bell and his vehicle than her supposed subjective belief that she was seized and thus under submission of law enforcement authority. In fact, Officer Adams testified he looked in Sutton's cup because she had not been searched, not because she was seized. Moreover, Sutton's interactions with Bell do not suggest she believed she was detained. Instead, she engaged in passionate kissing in plain sight of law enforcement (even passing drugs), without asking permission to kiss Bell.

Considering the totality of the circumstances, we do not find the traffic stop became unlawful. The district court did not err in denying the motion to suppress the methamphetamine found in Sutton's QuikTrip cup.

*Even if officers illegally seized Sutton, the methamphetamine evidence is admissible under the attenuation doctrine.*

The State alternatively relies on the attenuation doctrine to support the denial of the motion to suppress. The State argues that, even if officers unconstitutionally seized

Sutton, the evidence discovered during the seizure was admissible since the officers discovered the evidence because of her intervening actions during the seizure.

The attenuation doctrine is an exception to the Fourth Amendment exclusionary rule, which looks to the causal relationship between the unconstitutional act and the discovery of evidence. *Christian*, 310 Kan. at 235 (citing *Utah v. Strieff*, 579 U.S. __, 136 S. Ct. 2056, 2061, 195 L. Ed. 2d 400 [2016]). It applies when "'the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that "the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained."'" *Christian*, 310 Kan. at 235 (quoting *Strieff*, 136 S. Ct. at 2061). No bright-line rule defines when the attenuation doctrine applies. 310 Kan. at 235. "Rather, courts must examine the particular facts of each case and determine whether those circumstances attenuate the taint of illegality." 310 Kan. at 235 (citing *Brown v. Illinois*, 422 U.S. 590, 603, 95 S. Ct. 2254, 45 L. Ed. 2d 416 [1975]).

We review a district court's application of the attenuation doctrine under the same standards as its decision to deny a motion to suppress. See *Christian*, 310 Kan. at 235 (using standard to review district court's ruling based on attenuation doctrine); *Jones*, 279 Kan. at 73-74 (using standard to review district court's decision on motion to suppress). That is, we review findings of fact for substantial competent evidence and we exercise de novo review over the ultimate legal conclusion of whether the attenuation doctrine can be applied. See *Christian*, 310 Kan. at 235 (review of district court's application of attenuation doctrine); see also *Jones*, 279 Kan. at 73-74 (review of district court's decision on motion to suppress).

The district court did not rule on this issue because it found Sutton was not seized under the Fourth Amendment. That said, the State raises this argument again on appeal, noting this panel can affirm the district court's decision if we find it reached the right

result for the wrong reason. See *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015) Kansas recognizes the "right for any reason rule," which provides that when a judgment is correct for any reason shown by the record, it should be affirmed even if the district court's reasoning is wrong. *Bergstrom v. Noah*, 266 Kan. 847, 875-76, 974 P.2d 531 (1999). As noted above, this issue was briefed and argued below by both parties. After the State raised it again on appeal, Sutton did not object or file a reply brief on appeal.

The Kansas Supreme Court analyzed the attenuation doctrine in *Christian*, even though the district court never addressed the issue, because it determined that another panel of this court had analyzed it incorrectly. 310 Kan. at 236. The court commented that it would "take the available facts, which are largely undisputed, and apply them, while also pointing out where the parties may not have developed facts." 310 Kan. at 236. We will do the same here.

At the hearing on the motion to suppress, the State maintained that even if the officers unlawfully detained Sutton, the methamphetamine evidence was still admissible because she came into possession of the drugs in front of the police officers. The State reasoned that, given Officer Hawley's training and experience in narcotics, Sutton and Bell's conspicuous behavior and the missing baggie of drugs provided him with reasonable suspicion that Bell and Sutton passed drugs between them while they kissed. Thus, the officers had probable cause to search the cup. The State also argued no evidence suggested the officers acted inappropriately. Ultimately, the State claimed the officers discovered the methamphetamine only because of Sutton's actions, and if she had not acted this way, they would not have charged her with possession.

The United States Supreme Court identified three factors to consider when determining whether the poisonous taint of an unlawful seizure or search has dissipated: (1) temporal proximity between the unlawful search or seizure and the discovery of the

evidence, (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct. *Brown*, 422 U.S. at 603-04; see *Strieff*, 136 S. Ct. at 2062. No one of these factors are controlling, and other factors may be relevant to an attenuation doctrine analysis. *Christian*, 310 Kan. at 236. On appeal, the State relies only on the second factor, arguing that intervening circumstances support applying the attenuation doctrine. Even so, we consider each factor in our analysis.

The first factor, the temporal proximity between the unlawful seizure and the discovery of the methamphetamine, does not favor attenuation unless there is extensive time between the two. See *Strieff*, 136 S. Ct. at 2062. The United States Supreme Court in *Brown* found that a time difference of less than two hours between the unconstitutional arrest and a confession was not long enough to favor attenuation and therefore supported suppression of the confession. 422 U.S. at 604-05. Here, the record does not reveal the time that passed between the removal of Sutton's handcuffs and the discovery of the methamphetamine in Sutton's cup. Still, the record does reveal the entire encounter with the Kansas City, Missouri police lasted around an hour. Thus, we assume the time that Sutton was supposedly unlawfully seized is less than one hour. Because the Court in *Brown* found that two hours was insufficient to favor attenuation, application of the first factor to the facts before us favors suppression of the methamphetamine.

The second factor, the presence of intervening circumstances, strongly favors the State's position. For the attenuation doctrine to apply, a sufficient intervening event must break the connection between the illegal seizure and the discovery of the evidence. See *Brown*, 422 U.S. at 603-04. The intervening circumstance must be independent of the illegal stop to break that connection. *State v. Manwarren*, 56 Kan. App. 2d 939, 953, 440 P.3d 606, *rev. denied* 310 Kan. 1068 (2019). On appeal, the State argues that when an individual commits a new crime in the presence of officers, an intervening circumstance has occurred.

13

In *State v. Talkington*, 301 Kan. 453, 345 P.3d 258 (2015), our Supreme Court addressed this factor of the attenuation doctrine. When determining whether there was a sufficiently intervening circumstance which breaks the causal chain between the unlawful seizure and the search, the court considered: (1) whether the officer saw the defendant violate any law, (2) whether the officer saw the defendant throw anything to the ground, and (3) whether there was probable cause to arrest. 301 Kan. at 487. A search based on reasonable suspicion satisfies the Fourth Amendment's requirements. *State v. Bennett*, 288 Kan. 86, 95, 200 P.3d 455 (2009).

Here, the officers witnessed Sutton and Bell exchange passionate kisses, where it appeared they were passing something between their mouths, and then witnessed Sutton spit into her cup. Further, Officer Hawley had 13 years of experience and training in narcotics, and the baggie of methamphetamine was missing from the patrol vehicle. These facts support a finding that the officer had reasonable suspicion of criminal activity to search the cup. The discovery of the apparent missing baggie of methamphetamine provided the officers with probable cause to arrest Sutton for possession of methamphetamine. See *State v. Hill*, 281 Kan. 136, 141, 130 P.3d 1 (2006) (stating that a warrantless arrest, made in a public place, "does not violate the Fourth Amendment or the Kansas Constitution if the arrest is based on probable cause that the person has committed or is committing a felony"); see also *State v. Chacon-Bringuez*, 28 Kan. App. 2d 625, 630, 18 P.3d 970 (2001) (defining probable cause to be "facts and circumstances sufficient to warrant a prudent person in believing that the suspect had committed or was committing an offense").

Sutton acted independently and initiated the sequence of events that led her to possessing methamphetamine. She requested her cup before whispering to and heavily kissing Bell, then spit into the cup right after they stopped kissing. For these reasons, under *Talkington*, Sutton's actions were an intervening circumstance which favors the State in attenuating the taint of illegality.

14

Finally, the third factor, whether the officer's misconduct was purposeful or flagrant, also supports attention. The exclusionary rule exists to deter police misconduct. *Davis v. United States*, 564 U.S. 229, 236-37, 131 S. Ct. 2419, 180 L. Ed. 2d 285 (2011). The attenuation doctrine's third factor reflects this rationale "by favoring exclusion only when the police misconduct is most in need of deterrence—that is, when it is purposeful or flagrant." *Strieff*, 136 S. Ct. at 2063. This final factor is perhaps the most critical to the analysis. See 136 S. Ct. at 2062 (identifying this factor to be "'particularly' significant"). Purposeful and flagrant misconduct is found where: "(1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed 'in the hope that something might turn up.'" *United States v. Simpson*, 439 F.3d 490, 496 (8th Cir. 2006) (quoting *Brown*, 422 U.S. at 605).

In *Strieff*, the United States Supreme Court considered whether an officer's conduct was flagrant by examining whether that officer acted in good faith. It determined the officer's "decision to initiate the stop was mistaken, [but] his conduct thereafter was lawful." 136 S. Ct. at 2063. This led the Court to rule that "there is no indication that this unlawful stop was part of any systemic or recurrent police misconduct." 136 S. Ct. at 2063. Considering whether an officer acted in good faith turns on the officer's state of mind. The officer could be acting in good faith if the officer made a mistake but honestly believed he or she had reasonable suspicion to detain the subject, not merely detaining the subject in hopes that criminal evidence would turn up. See 136 S. Ct. at 2063-64.

Consistent with these considerations, our Supreme Court has found flagrant misconduct when an officer knowingly detains someone without authority. See *State v. Cleverly*, 305 Kan. 598, 612, 385 P.3d 512 (2016). The court in *Cleverly* adheres to the United States Supreme Court's flagrancy standard. See *Kaupp v. Texas*, 538 U.S. 626, 628, 633, 123 S. Ct. 1843, 155 L. Ed. 2d 614 (2003) (finding flagrant misconduct in warrantless arrest in arrestee's home after officers were denied warrant and at least some

officers knew they lacked probable cause); *Taylor v. Alabama*, 457 U.S. 687, 692-94, 102 S. Ct. 2664, 73 L. Ed. 2d 314 (1982) (finding flagrant misconduct where arrest made without probable cause to interrogate suspect in hope that something might turn up); *United States v. Fox*, 600 F.3d 1253, 1262 (10th Cir. 2010) (finding officer's misconduct was flagrant when he detained motorist without reasonable suspicion to obtain consent to search in hope that something might turn up).

To assess the purpose of the misconduct, Kansas courts examine "factors such as an officer's regular practices and routines, an officer's reason for initiating the encounter, the clarity of the law forbidding the illegal conduct, and the objective appearance of consent." *Manwarren*, 56 Kan. App. 2d 939, Syl. ¶ 11.

Officer Adams' testimony that he believed Sutton was detained goes to his state of mind. Arguably, this finding might favor Sutton. Yet this testimony shows the detention was not in bad faith. Officer Adams also testified that he believed keeping Sutton near the guardrail was for her safety, and he was waiting for the Leawood Police to arrive to take over the investigation of Bell, per protocol. Further, Officer Adams was courteous throughout his encounter with Sutton, including getting her drink out of Bell's car at her request. Nor is there any evidence this supposed illegal seizure was a part of any systemic or recurrent police misconduct. To the contrary, the evidence suggests that if Sutton was illegally seized, it was an isolated instance in connection with a bona fide investigation of Bell and a delay caused by complicated jurisdictional issues (created by Bell's failure to promptly pull over when the Missouri officers began the traffic stop). Therefore, this factor also favors the State in attenuating the taint of illegality.

When applying all three factors, the evidence discovered on Sutton's person was admissible because the supposed unlawful seizure was sufficiently attenuated. Although the temporal proximity between the seizure and the discovery of the methamphetamine favors excluding the evidence, the other two attenuation factors (which support the State)

16

outweigh that consideration. The commission of the crime is a critical intervening circumstance that is independent of the illegal seizure. Nor is there any evidence the officer's supposed seizure of Sutton reflected flagrantly unlawful police misconduct. As a result, even if Sutton were, in fact, unlawfully detained (which we do not find that she was), we find the district court's decision to admit the evidence was also correct because its discovery was sufficiently attenuated from the illegal detention.

Affirmed.

* * *

WARNER, J., concurring: I disagree with my colleagues' assessment that Linda Sutton's encounter with the Missouri law enforcement officers was voluntary and do not join that portion of the majority opinion. In my view, a reasonable person in Sutton's shoes—recently handcuffed and practically stranded on the side of a busy divided highway with law enforcement awaiting the arrival of Leawood police officers—would not feel she was free to leave. Nevertheless, I agree with the majority opinion's conclusion that Sutton's subsequent interactions with the driver gave rise to an intervening event, attenuated from the original detention, that justified the officers' search of her cup and her subsequent arrest. I therefore join the opinion's attenuation analysis and concur in the judgment.